No. 20-51016

# In the United States Court of Appeals for the Fifth Circuit

♦

MICHAEL CARGILL,

*Plaintiff-Appellant,*

v.

MERRICK B. GARLAND, ATTORNEY GENERAL, et al.,

*Defendants-Appellees.*

♦

On Appeal from the United States
District Court for the Western District of Texas
Case No. 1:19-cv-349

♦

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION AND THE CENTER TO KEEP AND BEAR ARMS IN SUPPORT OF APPELLANT AND REVERSAL**

♦

GEORGE A. MOCSARY
UNIVERSITY OF WYOMING
COLLEGE OF LAW
1000 East University Ave.
Department 3035
Laramie, WY 82071
(307) 766-5262
gmocsary@uwyo.edu

JOSEPH G.S. GREENLEE
 *Counsel of Record*
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgr@fpchq.org

[Additional counsel listed on inside cover]

CODY J. WISNIEWSKI
MOUNTAIN STATES LEGAL
FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
cody@mslegal.org

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, in addition to those listed in the party briefs, with a financial interest in the outcome of this litigation. In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .........i

TABLE OF CONTENTS ............................................................................ii

TABLE OF AUTHORITIES................................................................ iii

STATEMENT OF *AMICI CURIAE* ......................................................1

CONSENT TO FILE ...............................................................................2

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT ...........................................................................................4

    I.   *Chevron* deference is a description of the consequences of an implied or presumed delegation of legislative authority. ..............4

    II.  This Court should apply the rule of lenity to resolve any perceived ambiguity, thereby preserving our separation of powers and due process principles. ........................................................................7

    III. Applying *Chevron* deference in criminal matters violates the separation of powers. ...............................................................12

        A.   Executive Powers.......................................................................14

        B.   Legislative Powers....................................................................16

        C.   Judiciary Powers. .....................................................................19

CONCLUSION ......................................................................................21

CERTIFICATE OF COMPLIANCE.....................................................23

CERTIFICATE OF SERVICE...............................................................24

# TABLE OF AUTHORITIES

## Cases

*Albanil v. Coast 2 Coast, Inc.*,
   444 F. App'x 788 (5th Cir. 2011) (unpublished) .................................... 7

*Cargill v. Barr*,
   2020 WL 7414524 (W.D. Tex. Nov. 23, 2020).................... 14, 15, 16, 17

*Carter v. Welles-Bowen Realty, Inc.*,
   736 F.3d 722 (6th Cir. 2013) ......................................................... 8, 10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ......................................................................... 5, 6

*Crandon v. United States*,
   494 U.S. 152 (1990) ............................................................................ 10

*Dep't of Transp. v. Ass'n of Am. Railroads*,
   575 U.S. 43 (2015) .............................................................................. 18

*Est. of Cowart v. Nicklos Drilling Co.*,
   505 U.S. 469 (1992) .............................................................................. 7

*Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
   920 F.3d 1 (D.C. Cir. 2019) ......................................................... 16, 17

*Gundy v. United States*,
   139 S. Ct. 2116 (2019) .......................................................................... 6

*Hydro Res., Inc. v. U.S. E.P.A.*,
   608 F.3d 1131 (10th Cir. 2010) (en banc) ............................................ 7

*INS v. St. Cyr*,
   533 U.S. 289 (2001) ............................................................................ 11

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) .......................................................................... 6

*McNally v. United States*,
   483 U.S. 350 (1987) .............................................................................. 9

*Mistretta v. United States,*
    488 U.S. 361 (1989) ............................................................. 18

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ............................................................. 20

*Nat'l Rifle Ass'n v. Brady,*
    914 F.2d 475 (4th Cir. 1990) .............................................. 15

*Touby v. United States,*
    500 U.S. 160 (1991) ............................................................. 18

*United States v. Bass,*
    404 U.S. 336 (1971) ........................................................... 8, 9

*United States v. Cardiff,*
    344 U.S. 174 (1952) ............................................................. 10

*United States v. Davis,*
    139 S. Ct. 2319 (2019) ........................................................... 9

*United States v. Thompson/Ctr. Arms Co.,*
    504 U.S. 505 (1992) ............................................................... 9

*United States v. Wiltberger,*
    18 U.S. (5 Wheat.) 76 (1820) ............................................... 8

*Whitman v. Am. Trucking Associations,*
    531 U.S. 457 (2001) ............................................................. 17

*Yates v. United States,*
    574 U.S. 528 (2015) ............................................................... 9

## Constitutional Provisions

U.S. CONST. art. I, § 1 ............................................................. 17

U.S. CONST. art. I, § 7 ............................................................. 17

U.S. CONST. art. II, § 3 ............................................................ 15

## Statutes and Regulations

18 U.S.C. § 922(o) ................................................................. 16

18 U.S.C. § 926(a) ................................................................. 14

26 U.S.C. § 7801(a)(2)(A) ....................................................... 14

26 U.S.C. § 7805 .................................................................... 14

28 C.F.R. § 0.130(a) .............................................................. 14

83 Fed. Reg. 66514 ................................................................ 16

83 Fed. Reg. 66523 ................................................................ 16

83 Fed. Reg. 66525 ................................................................ 17

83 Fed. Reg. 66530 ........................................................... 17, 20

## Other Authorities

Blackstone, William, 1 COMMENTARIES (3d ed. 1768) ............................ 13

Blackstone, William, 4 COMMENTARIES (3d ed. 1769) ............................ 13

JOURNAL OF THE CONSTITUTIONAL CONVENTION, KEPT BY JAMES
     MADISON (E.H. Scott ed., 1893) ........................................... 20

Larkin, Jr., Paul J., *Chevron and Federal Criminal Law*, 32 J.L.
     & POL. 211 (2017) .......................................................... 5

Letter from Thomas Jefferson to George Hay (May 20, 1807) ............... 13

Letter from Thomas Jefferson to James Madison (Jan. 22, 1797) ......... 13

Merrill, Thomas W. & Hickman, Kristin E., *Chevron's Domain*,
     89 GEO. L.J. 833 (2001) .................................................... 5

PROCEEDINGS OF SIXTH NATIONAL CONFERENCE, vol. 6 (1917) ................ 19

Sunstein, Cass R., *Nondelegation Canons*, 67 U. Chi. L. Rev.
     315 (2000) ............................................................... 8, 11

THE FEDERALIST NO. 47 ............................................................. 12

THE FEDERALIST NO. 84 ............................................................. 21

THE WORKS OF THOMAS JEFFERSON, vol. 10 (Paul Leicester Ford ed., 1905) ............................................................................................. 13

THE WRITINGS OF THOMAS JEFFERSON, vol. 9 (Lipscomb & Bergh eds., 1905) ............................................................................................. 13

THE WRITINGS OF THOMAS JEFFERSON: 1788-1792 (Paul Leicester Ford ed., 1895) ..................................................................................... 21

## STATEMENT OF *AMICI CURIAE*

Firearms Policy Coalition (FPC) is a nonprofit organization devoted to advancing individual liberty and defending constitutional rights. FPC accomplishes its mission through legislative and grassroots advocacy, legal and historical research, litigation, education, and outreach programs. FPC's legislative and grassroots advocacy programs promote constitutionally based public policy that respects individual freedom and self-government. Its historical research aims to discover the founders' intent and the Constitution's original meaning. And its legal research and advocacy aim to ensure that constitutional rights maintain their original scope. Since its founding in 2015, FPC has emerged as a leading advocate for individual liberty in state and federal courts, regularly participating as a party or *amicus curiae*. FPC has an interest in this case because it is involved in litigation involving many of the same issues presented here. *See Firearms Policy Coalition, Inc. v. Whitaker*, No. 18-3083 (D.D.C.).

The Center to Keep and Bear Arms (CKBA) is a project of Mountain States Legal Foundation (MSLF), a nonprofit, public interest legal foundation organized under the laws of Colorado. MSLF was founded in

1977 to defend the Constitution, protect private property rights, and advance economic liberty. CKBA was established in 2020 to continue and to advance MSLF's litigation regarding Americans' natural right to self-defense. CKBA represents individuals and organizations challenging infringements on the constitutionally protected right to keep and bear arms.

## CONSENT TO FILE

All parties have consented to the filing of this brief.[1]

## SUMMARY OF ARGUMENT

*Chevron* deference is neither a standard nor a tool of interpretation. Rather, it is a description of a presumed congressional delegation of legislative decision-making authority to an agency and a framework for evaluating the consequences of such presumed delegation. So understood, the relation between *Chevron* deference, the rule of lenity, and how to address an executive agency's failure to exercise delegated legislative authority illuminates proper resolution of agency actions

---

[1] No counsel for a party in this case authored this brief in whole or part. No party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No person other than *amici* and their members contributed money intended to fund the preparation or submission of this brief.

involving criminal penalties. Implied delegations of legislative authority are suspect where the premise of such implication is a congressional failure to use clear statutory language, thus "requiring" an executive branch agency to make legislative policy decisions. This suspicion should become prohibitory where a statute bearing criminal penalties is involved.

This Court need not defer to an executive agency's interpretation where, as here, there is an applicable canon of construction that guides this Court's hand in removing ambiguity—or at least resolving ambiguity—from the statute in question. Given this matter involves a criminal penalty, if the Court determines there is ambiguity in the definition of "machinegun," then this Court should resolve that ambiguity in favor of the individual, not the executive agency, under the rule of lenity.

Finally, *Chevron* deference is wholly inapplicable in matters involving the interpretation of newly created crimes given it violates our Constitution's separation of powers. An executive agency cannot be allowed to create criminal laws through "interpretation" of "vague" statutes, enforce its own newly created law, and then receive judicial

deference as to the evaluation of the agency's authority, construction, and enforcement.

This Court should remand this matter to the district court with instruction for that court to review the plain meaning of the term "machinegun," and if ambiguous, to resolve that ambiguity by applying the rule of lenity, not *Chevron* deference.

## ARGUMENT

### I. *Chevron* deference is a description of the consequences of an implied or presumed delegation of legislative authority.

*Chevron* deference is a judicially created doctrine based on the inference that ambiguous statutory language was intended to delegate authority to the executive branch to make legislative decisions left unanswered by Congress within the statute in question. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Agencies form policy through legislative delegation by making "rules to fill any gap left . . . by Congress." *Id.* at 843. "Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit." *Id.* at 844. Gaps require "reconciling conflicting policies" and result from congressional failure to "consider the question" or inability "to forge a coalition on either side of the question." *Id.* 865. Deference is applied

4

when "resolving the competing interests" left either intentionally or inadvertently by Congress in passing legislation. *Id.* at 865–66.

Chevron does not purport to be a tool to discover the meaning of statutory language. It applies only where the meaning of the statute is sufficiently indeterminate as to leave more than one plausible reading. From such indeterminacy, *Chevron* presumes an implied desire by Congress to have the executive branch make the *policy* choice as to which meaning *should* be selected. Thomas W. Merrill & Kristin E. Hickman, *Chevron's Domain*, 89 GEO. L.J. 833, 872 (2001) ("[I]f *Chevron* depends upon a presumption about congressional intent, then *Chevron* should apply only where Congress would want *Chevron* to apply."). That delegation, however, is wholly inapplicable in the context of a statute with criminal applications. Paul J. Larkin, Jr., *Chevron and Federal Criminal Law*, 32 J.L. & POL. 211, 229 (2017) ("Affording *Chevron* deference to the Justice Department's interpretations of the federal criminal code would likely lead to . . . unduly expansive interpretations of federal criminal statutes").

Here, this Court must first employ traditional canons of interpretation to decide whether the underlying statute is sufficiently indeterminate to

warrant deference. As addressed *infra*, the rule of lenity—a standard canon of construction—is applicable in this matter, given the criminal penalty at stake, and thus *Chevron* is inappropriate. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("[B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction.") (citing *Chevron*, 467 U.S. at 843 n.9); *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality opinion) ("Only after a court has determined a challenged statute's meaning can it decide whether the law sufficiently guides executive discretion to accord with Article I."). Accordingly, this Court need not move to the second step of the *Chevron* analysis and need not apply that doctrine here.

Deference is also improper where the agency denies ambiguity or policy discretion in the first instance, or simply declines to make the substantive policy choice presented by an ambiguity. Even if *Chevron* deference could trump the rule of lenity, it cannot in this case because it has been waived. *See* ROA.407 (the ATF arguing that "deference is unwarranted because neither party contends that it should apply"). *Chevron* deference is an implied grant of discretion to the agency—an agency is not obligated to invoke that discretion in either its rulemaking

or in defense of its rule. A court should not, therefore, resolve any apparent tension between the agency's litigation choices and its rulemaking—at least where it is the agency that bears any adverse consequences of those litigation choices. *See Hydro Res., Inc. v. U.S. E.P.A.*, 608 F.3d 1131, 1146 (10th Cir. 2010) (en banc) (quoting *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992)) ("[W]hen the agency doesn't ask for deference to its statutory interpretation, 'we need not resolve the . . . issues regarding deference. . . .'"); *Albanil v. Coast 2 Coast, Inc.*, 444 F. App'x 788, 796 (5th Cir. 2011) (unpublished) ("Plaintiffs did not raise their *Chevron* argument in the district court. . . . Thus, they have waived this argument.").

## II.    This Court should apply the rule of lenity to resolve any perceived ambiguity, thereby preserving our separation of powers and due process principles.

Because the rule of lenity is an interpretive canon implementing constitutional and pre-constitutional principles, it should supersede *Chevron* deference. The rule of lenity is a specific tool for deciding whether a statute with criminal applications is sufficiently ambiguous to pose an improper delegation to the executive. That is, the canon serves

to cabin the executive's reach in the criminal context. It is, therefore, at odds with any delegation implied from ambiguity.

The rule of lenity is one of "the most venerable and venerated of interpretive principles," *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 731 (6th Cir. 2013) (Sutton, J., concurring), and is deeply "rooted in a constitutional principle," Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 332 (2000). As Chief Justice Marshall observed, the rule of lenity:

> [I]s perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment.

*United States* v. *Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820); *see also United States v. Bass*, 404 U.S. 336, 348 (1971) (the rule of lenity is driven by the need to provide "fair warning . . . of what the law intends to do if a certain line is passed" and assurance that "legislatures . . . define criminal activity").

> Only the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them. Vague laws transgress both of those

8

> constitutional requirements. They hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct.

*United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

Legislative definition of crimes has "long been part of our tradition." *Bass*, 404 U.S. at 348. Based on such tradition and principles, the Supreme Court has long held that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates v. United States*, 574 U.S. 528, 547–48 (2015) (citation omitted). The rule of lenity "is not a rule of administration," but "a rule of statutory construction whose purpose is to help give authoritative meaning to statutory language." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 n.10 (1992). "[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally v. United States,* 483 U.S. 350, 359–60 (1987) (citations omitted).

The rule is particularly important where agencies can define and, especially as in this case, redefine, crimes. *See Carter*, 736 F.3d at 731–

9

32 (Sutton, J., concurring).[2] Because agencies have a natural tendency to broadly interpret the statutes they administer, deference in the criminal context "would turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity." *Crandon v. United States*, 494 U.S. 152, 178 (1990) (Scalia, J., concurring).

Lenity must be applied in criminal matters before any implication that Congress delegated legislative authority to executive agencies. "Rules of interpretation bind all interpreters, administrative agencies included. That means an agency, no less than a court, must interpret a doubtful criminal statute in favor of the defendant." *Carter*, 736 F.3d at 731. "If you believe that *Chevron* has two steps, you would say that the relevant interpretive rule—the rule of lenity—operates during step one. Once the rule resolves an uncertainty at this step, 'there [remains], for *Chevron*

---

[2] The ATF's complete reversal on the legality of bump stocks means that well-meaning citizens, like Mr. Cargill, who detrimentally relied on the ATF's ten letter rulings, must now forfeit their property or face incarceration. *See United States v. Cardiff*, 344 U.S. 174, 176 (1952) ("Words which are vague and fluid may be as much of a trap for the innocent as the ancient laws of Caligula.") (citation omitted).

purposes, no ambiguity . . . for an agency to resolve.'" *Id.* (quoting *INS v. St. Cyr*, 533 U.S. 289, 320 n.45 (2001)).

The basis for the rule of lenity demonstrates why *Chevron* deference cannot apply to statutes with criminal applications. If such a statute is sufficiently ambiguous as to leave two plausible readings distinguishable primarily by legislative policy choices, then it is incumbent on the *legislature* to have made such choices itself rather than delegate them to others. *See* Sunstein, 67 U. CHI. L. REV. at 332 ("One function of the lenity principle is to ensure against delegations."). If the legislature failed to do so in a manner discernable by a court, then either the narrower reading must prevail, or the statute is too uncertain to impose criminal consequences at all and is void for vagueness.

Given the fundamental constitutional perils implicit in ambiguous criminal laws and the delegation of the legislative power to define crimes, the rule of lenity can be seen, in part, as a facet of the doctrine of constitutional avoidance. To infer that Congress implicitly delegated the power to define crimes would force a determination as to whether such a vague statute or suspect delegation were constitutional. Lenity's age-old canon of construction implicitly assumes that, despite employing

imperfect statutory language, Congress did *not* intend to delegate a traditionally (in our constitutional order) legislative function.

## III.    Applying *Chevron* deference in criminal matters violates the separation of powers.

James Madison declared that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, selfappointed, or elective, may justly be pronounced the very definition of tyranny." THE FEDERALIST NO. 47. Madison, advocating for the ratification of the Constitution, was responding to an objection that the Constitution violated "the political maxim, that the legislative, executive, and judiciary departments ought to be separate and distinct"—an "essential precaution in favor of liberty." *Id.* Madison was confident "that it will be made apparent to every one, that the charge cannot be supported." *Id.* "Were the federal Constitution . . . really chargeable with the accumulation of power, or with a mixture of powers, having a dangerous tendency to such an accumulation, no further arguments would be necessary to inspire a universal reprobation of the system." *Id.*

Madison was echoing William Blackstone, who had stated that "[i]n all tyrannical governments the supreme magistracy, or the right both of

*making* and of *enforcing* the laws, is vested in one and the same man, or one and the same body of men; and wherever these two powers are united together, there can be no public liberty." 1 William Blackstone, COMMENTARIES 146 (3d ed. 1768). Blackstone believed that the delegation of lawmaking power was a "disgrace." 4 *id.* at 424.

The Constitution was ratified with the understanding and expectation that these powers were separate and distinct. Thomas Jefferson wrote to Madison in 1797, explaining that "[the] principle [of the Constitution] is that of a separation of Legislative, Executive and Judiciary functions except in cases specified. If this principle be not expressed in direct terms, it is clearly the spirit of the Constitution. . . ." Letter from Thomas Jefferson to James Madison (Jan. 22, 1797), *in* 9 THE WRITINGS OF THOMAS JEFFERSON 368 (Lipscomb & Bergh eds., 1905); *see also* Letter from Thomas Jefferson to George Hay (May 20, 1807), *in* 10 THE WORKS OF THOMAS JEFFERSON 404 (Paul Leicester Ford ed., 1905) ("The leading principle of our Constitution is the independence of the Legislature, executive and judiciary of each other").

Jefferson and Madison—and most of our founders—would have been puzzled by the decision below, which upheld the executive branch's

exercise of "all powers, legislative, executive, and judiciary," in direct contradiction to the "spirit of the Constitution."

## A. Executive Powers.

Congress instructed that the "administration and enforcement" of the National Firearms Act of 1934 (NFA) "shall be performed by or under the supervision of the Attorney General." 26 U.S.C. § 7801(a)(2)(A). With this, the Attorney General was given the authority to "prescribe all needful rules and regulations for the enforcement" of the Act. 26 U.S.C. § 7805. Congress then granted the Attorney General the authority to "prescribe only such rules and regulations as are necessary to carry out the provisions" of the Gun Control Act of 1968 (GCA). 18 U.S.C. § 926(a). The Attorney General in turn delegated to the ATF the duties to "[i]nvestigate, administer, and enforce the laws related to" the NFA and GCA. 28 C.F.R. § 0.130(a).

The court below justified the ATF's use of executive authority effectively to create legislation by explaining that "section 926(a) is a broad enough delegation for ATF to issue a legislative rule that fills gaps in the definition of 'machinegun' under the GCA." *Cargill v. Barr*, No. 1:19-CV-349-DAE, 2020 WL 7414524, at ¶128 (W.D. Tex. Nov. 23, 2020).

The court explained that congressional delegation of authority provided under the GCA "authorizes the [Attorney General] to promulgate those regulations which are 'necessary'" and "almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'" *Id.* (quoting *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990)). The court determined that "Congress can delegate some authority to the Executive Branch (or independent agencies) to engage in rulemaking without violating principles of non-delegation, even where such rulemaking may lead to criminal consequences." *Id.* at ¶131. Moreover, the court added, "statutory delegation is constitutional as long as Congress lays down by legislative act an *intelligible principle* to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Id.* at ¶132. (citation omitted) (emphasis added).

Congress did indeed "lay[] down by legislative act an intelligible principle to which the [ATF] is directed to conform." But the ATF far exceeded that directive. Specifically, the ATF was directed to "carry out," "[i]nvestigate," "administer," and "enforce" the law. These duties are consistent with the executive power to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. But they cannot reasonably

be read to allow for the creation of laws—which, as explained next, is among the ways the ATF inappropriately exceeded its congressionally delegated power here.

## B. Legislative Powers.

As the court below acknowledged, the ATF's Rule did not merely administer or enforce Congress's law—it created new criminal law. "Defendants intended the Final Rule to speak with the force of law," and "the Final Rule 'unequivocally bespeaks an effort by [Defendants] to adjust the legal rights and obligations of bump-stock owners—i.e., to act with the force of law.'" *Cargill*, 2020 WL 7414524 at ¶118 (quoting *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 18 (D.C. Cir. 2019), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019), and *cert. denied*, 140 S. Ct. 789 (2020)). "[T]he Final Rule states that bump stocks '*will be prohibited when* this rule becomes effective.'" *Id.* (quoting 83 Fed. Reg. 66514) (emphasis in original). "[B]efore the Final Rule's effective date—any person 'currently in possession of a bump-stock-type device *is not acting unlawfully*.'" *Id.* (quoting 83 Fed. Reg. 66523) (emphasis in original). "The Final Rule also provides guidance for how individuals can comply '*to avoid violating* 18 U.S.C. § 922(o)' and

emphasizes that it will 'criminalize *only future conduct, not past possession*' of bump-stock-type devices." *Id.* (quoting 83 Fed. Reg. 66525, 66530) (emphasis in original).

To make lawful activity unlawful is to create law. As Judge Henderson noted in *Guedes*, the ATF exceeded its authority:

> The statutory definition of "machinegun" does not include a firearm that shoots more than one round "automatically" by a single pull of the trigger **AND THEN SOME** (that is, by "constant forward pressure with the non-trigger hand"). *Bump-Stock-Type Devices*, 83 Fed. Reg. at 66,532. By including more action than a single trigger pull, the Rule invalidly expands section 5845(b), as the ATF itself recognized in the rulemaking.

*Guedes*, 920 F.3d at 44 (Henderson, J., concurring in part and dissenting in part) (emphasis in original).

The Constitution provides that "All legislative Powers . . . granted" to the federal government "shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. CONST. art. I, § 1. "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States." U.S. CONST. art. I, § 7, cl. 2. "This text permits no delegation of those powers." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001).

Thus, "the Court has derived the nondelegation doctrine: that Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States*, 500 U.S. 160, 165 (1991). "For example, Congress improperly 'delegates' legislative power when it authorizes an entity other than itself to make a determination that requires an exercise of legislative power." *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 68 (2015) (Thomas, J., concurring in the judgment). "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Touby*, 500 U.S. at 165 (quoting *Mistretta v. United States,* 488 U.S. 361, 371 (1989)).

The Constitution carefully establishes our system, and safeguards it, to ensure that legislation requires the approval of both houses of Congress, as well as the president—thus requiring today the consideration of 536 elected representatives directly accountable to their constituents. *See Dep't of Transp.*, 575 U.S. at 61 (Alito, J., concurring) ("The principle that Congress cannot delegate away its vested powers exists to protect liberty. Our Constitution, by careful design, prescribes a process for making law, and within that process there are many

accountability checkpoints. It would dash the whole scheme if Congress could give its power away to an entity that is not constrained by those checkpoints.") (citation omitted). By contrast, here, the ATF effectively created its own legislation, entirely independent of the legislative branch, and unaccountable to the People or any other branch of government. The ATF, in reconsidering the definition of "machinegun" to include bump-stock-type devices, did not merely engage in an interpretive exercise. Instead, the ATF created a new federal criminal law—criminalizing the possession of an item that was previously not prohibited and which, by a plain reading of the statute, does not meet the definition it is purportedly banned under. This exercise of legislative authority by an executive agency cannot stand, for "[l]iberty requires accountability." *Id.* at 1234 (Alito, J., concurring).

### C. Judiciary Powers.

Rufus King emphasized the importance for judges to "expound the law as it should come before them, free from the bias of having participated in its formation." 6 Proceedings of Sixth National Conference 291 (1917). Madison's Journal of the Constitutional Convention represents the founders' view:

> MR. [Caleb] STRONG thought, with MR. [Elbridge] GERRY, that the power of making, ought to be kept distinct from that of expounding, the laws. No maxim was better established. The Judges in exercising the function of expositors might be influenced by the part they had taken in passing the laws.

JOURNAL OF THE CONSTITUTIONAL CONVENTION, KEPT BY JAMES MADISON 400 (E.H. Scott ed., 1893). Thus, the framers established an independent judiciary in the Constitution.

But if this court applies *Chevron* here, the "agency's construction of the statute" will be accepted, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). Thus, where the executive branch has "criminalize[d] future conduct," 83 Fed. Reg. 66525, and is responsible for "enforcing" the prohibition against that conduct, 83 Fed. Reg. 66515, its interpretation of how to enforce the prohibition would be granted deference.

This accumulation of powers in a single, unaccountable bureau is precisely what the founders endeavored to avoid. "An elective despotism was not the government we fought for; but one in which the powers of government should be so divided and balanced among the several bodies of magistracy as that no one could transcend their legal limits without

being effectually checked and restrained by the others." THE FEDERALIST No. 84.

Jefferson warned that "[t]o take a single step beyond the boundaries" established in the Constitution "is to take possession of a boundless field of power." THE WRITINGS OF THOMAS JEFFERSON: 1788-1792, at 285 (Paul Leicester Ford ed., 1895). The ATF ventured well beyond those boundaries here, and if these transgressions are tolerated, the lasting implications will affect far more than mere bump stocks.

## CONCLUSION

The rule of lenity, and not deference to the ATF, should apply here. Because the rule of lenity compels this Court to resolve any ambiguity in Mr. Cargill's favor, this Court should reverse the district court and direct entry of judgment for Mr. Cargill.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
  *Counsel of Record*
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
(916) 378-5785
jgr@fpchq.org

GEORGE A. MOCSARY
UNIVERSITY OF WYOMING
COLLEGE OF LAW
1000 East University Avenue
Department 3035
Laramie, WY 82071
(307) 766-5262
gmocsary@uwyo.edu

CODY J. WISNIEWSKI
MOUNTAIN STATES LEGAL
FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
cody@mslegal.org

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 4,158 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionately spaced Century Schoolbook font.

I certify that the text of the electronic brief and the hard copies of the brief are identical.

I certify that the PDF was scanned with Windows Defender Antivirus version 1.295.1532.0, and according to the program, the document is virus free.

No privacy redactions were necessary.

Dated this 15th day of March 2021.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2021, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Fifth Circuit, which will distribute the brief to all attorneys of record in this case.

Dated this 15th day of March 2021.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
*Counsel for Amici Curiae*